**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**



ADELINA C. ROCABRUNA,
29 Running Brook Lane,
Sterling, Virginia 20164

and

MIGUEL A. ROCABRUNA
29 Running Brook Lane,
Sterling, Virginia 20164

v.

1:12 cv 506 LMB/TCB

BANK OF AMERICA, N.A.,
SERVE: CT Corporation System, Registered Agent
      4701 Cox Road, Suite 301
      Glen Allen, VA 23060

## COMPLAINT

The Plaintiffs, Adelina C. Rocabruna and Miguel A. Rocabruna (hereafter "Plaintiffs"), by counsel, and for their Complaint against Defendant, alleges as follows:

### PRELIMINARY STATEMENT

1.    This is an action for actual, statutory and punitive damages, costs and attorney's fees brought pursuant to 15 U.S.C. § 1681 *et seq.* (Federal Fair Credit Reporting Act or "FCRA"); 12 U.S.C. § 2601 *et seq.* (Real Estate and Settlement Procedures Act or "RESPA"); breach the implied covenant of good faith and fair dealing under Virginia law.

2.    At its simplest, the Fair Credit claims in this case alleges that Bank of America inaccurately reported Plaintiffs as having defaulted on their mortgage and otherwise having violated their obligations to their creditor. There is no objective basis

1

for Bank of America to have reported this to the credit bureaus. For all of their financial struggles over the last years of their relationship with Bank of America, Plaintiffs have paid their mortgage and honored their obligations in the manner that Bank of America had insisted.

3.      When Plaintiffs learned that Bank of America had inaccurately placed their mortgage payments in another consumer's account, reported them as in default, and that such inaccuracies had destroyed their credit, they began a dispute process, through the national credit bureaus.  Bank of America then refused to investigate or correct its defamatory reporting. In doing so, it violated both the FCRA and the RESPA.

4.      Plaintiffs also bring this suit based state law claims for breach of the covenant of good faith and fair dealing implied into every Virginia contract. In this case, the Plaintiffs and Defendants were parties to a note and deed of trust, both contracts under Virginia law.  The simple allegations are: when a mortgage lender promises (in writing even) to modify an eligible loan to prevent impending default, homeowners who live up to their end of the bargain have a right to expect that promise to be kept. This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure and to which it agreed when receiving a huge taxpayer funded bailout.

5.      In 2008, Bank of America accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. On April 17, 2009, Steve R. Bailey, Sr. Vice President of Bank of America signed a contract with the U.S. Treasury agreeing to participate in HAMP -- a program in which

Bank of America received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

6.    As a participating servicer in HAMP, Bank of America has, in turn, entered into written agreements with consumers for temporary trial modifications.[1] Consumers like the Plaintiffs have complied with these agreements by submitting the required documentation and making payments. Despite such efforts, Bank of America has ignored its contractual obligations to modify their loans permanently.

## PARTIES

7.    The Plaintiffs, ADELINA C. AND MIGUEL A. ROCABRUNA ("Plaintiffs"), are natural persons and a consumers as defined by 15 U.S.C. § 1681a(c).

8.    Upon information and belief, BANK OF AMERICA, N.A., is a National Bank doing business as a mortgage originator and servicer, and at all times relevant hereto was a "furnisher" as governed by the FCRA.

9.    Bank of America, N.A. is the entity that contracted with the United States Department of Treasury as alleged below.

10.    Upon information and belief, BAC HOME LOAN SERVICING, LP was and is a wholly owned subsidiary of Bank of America, N.A. created and operated with shared management and control as the servicing agent for Bank of America, N.A. Upon information and belief the Plaintiff alleges that BAC Home Servicing, L.P. is also a servicer under RESPA and at all times relevant hereto was a "furnisher" as governed by the FCRA.

---

[1] This is a "consumer with Bank of America, Bank of America with consumer" direct contract rather than the "Bank of America with U.S. Government, U.S. Government with Bank of America" contract. The former is a simple common law contract to which the consumer is a party, while in the latter, consumers are only a third party.

3

11.   BAC Home Servicing, L.P. is the entity that contracted and issued the loan modification and trial plan for Plaintiffs.

12.   For all factual and legal purposes relevant to this complaint, both Defendants operated as a single mortgage lending and servicing entity.  It has shared ownership, shared management and represented to the public and the Plaintiffs that they were one and the same.

## JURISDICTION

13.   This Court has federal question jurisdiction of under the FRCA, 15 U.S.C. § 1681(p), the RESPA, 12 U.S.C. §2605(f), and 28 U.S.C. §1331.

14.   This court also has jurisdiction over the state law claims by supplemental jurisdiction under 28 U.S.C. §1367.

15.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) inasmuch the Defendant maintains registered offices within the boundaries of the Eastern District of Virginia, Plaintiffs reside in this District and Division and a significant part of the Plaintiffs' claim occurred in Virginia.

## FACTUAL BACKGROUND

### A. The Foreclosure Crisis

16.   Over the last several years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[2] Virginia reported 17,669 properties with foreclosure filings for the second quarter of 2010, the 11th highest activity level in the nation.  The

---

[2] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.

latest total represents a 22 percent increase from the first quarter of the year and nearly 15 percent above the level reporting for the second quarter of 2009.[3]

17.   Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

### B.   Creation of Home Affordable Modification Program

18.   Motivated in significant part by such concerns, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 *et. seq.* (2009).

19.   The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C.A. § 5201.

20.   The Act established the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. In exercising its authority to administer TARP, the Act mandated that the Secretary of Treasury take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).   It further mandated that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of

---

[3]   www.realtytrac.com/ContentManagement/Library.aspx?ChannelID=13&ItemID=9600

programs to "minimize foreclosures" and to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." 12 U.S.C.A. § 5219.

21.   On February 18, 2009, the Treasury Secretary and the Director of the Federal Housing Finance Agency created a uniform loan modification protocol, previously identified as HAMP, the program that is at issue in this case.

22.   HAMP is funded by the federal government, primarily with TARP funds. In the last two years, the Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

### C. Bank of America's Broken Promises Under HAMP

23.   The mortgage industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. Bank of America is a servicer and its actions described herein were made as agents for the entities that hold mortgage loans.

24.   Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification.

25.   Should a servicer elect to participate in HAMP, they execute a Servicer Participation Agreement ("SPA") with the federal government[4]. On April 17, 2009, Steve

---

[4] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program are subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary.

R. Bailey, Sr. Vice President of Bank of America, NA, executed an SPA, thereby making Bank of America, N.A. a participating servicer in HAMP.

26.   The SPA executed by Bank of America incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA 1.A.), and are incorporated by reference herein.

27.   A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan.[5] The Trial Period Plan defines a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

28.   Bank of America offers Trial Period Plans to eligible homeowners by way of a Trial Period Plan Agreement, which describes the homeowner's duties and obligations under the plan and contractually promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

29.   If the homeowner executes the Trial Period Plan Agreement, complies with objective documentation requirements and makes all three Trial Period Contract monthly

---

[5] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

30. There is no lender or servicer discretion involved or permitted. Once the servicer/lender contracts a Trial Period Plan, the consumer will be entitled to a permanent modification so long as they produce the defined set of documents required to verify the facts previously stated and also comply with the plan payment requirements during the Trial Period Plan. Further, the terms of that permanent modification are also non-discretionary and are objectively determinable for each consumer based on the "waterfall" analysis required under the HAMP program.

31. Bank of America has routinely failed to live up to its end of Trial Period Plan Agreements and to offer permanent modifications to homeowners. In March 2010, the U.S. Treasury reported that Bank of America had 1,085,894 HAMP-eligible loans in its portfolio. Of these loans, just 32,900 resulted in permanent modifications (approximately 3 %) even though many more homeowners had made the payments and submitted the documentation required by their Trial Period Plan Agreement.

32. By failing to live up to the Trial Period Plan Agreements and convert them into permanent loan modifications, Bank of America is not only leaving homeowners in limbo and stressful anxiety, wondering if their home can be saved, Bank of America is also preventing homeowners from pursuing other avenues of resolution, including obtaining alternate lending or using the money they are putting toward Trial Period Plan payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default or reducing the harm from it.

**D.  Factual Allegations as to Plaintiffs**

33. Plaintiffs purchase their home in September 2006, and took out a mortgage with Countywide Home Loans ("Countrywide") in the amount of approximately $329,600.00.

34. In March 2009, Plaintiffs entered into a loan modification agreement with Countrywide ("Countrywide Modification"), which reduced their mortgage payments to $2,177.62. Once the Plaintiffs accepted the loan modification and made their payments, the Plaintiffs were current on their mortgage obligations.

35. Plaintiffs consistently paid on time in accordance with their Countrywide Modification.

36. Countrywide was later acquired by Bank of America.

37. On or around December 2009, Plaintiffs were encouraged to apply for a HAMP modification. Immediately thereafter, Plaintiffs forwarded their completed application to Bank of America with the requested documentation including the signed Bank of America Request for Modification Affidavit, income verification documents and the required signed 4506-T Request for Tax Return form to be considered for HAMP.

38. On or about January 21, 2010, Bank of America forwarded Plaintiffs a document entitled "Home Affordable Modification Trial Period Plan (Step One of Two Step Documentation Process)", which stated that the plan was effective on March 1, 2010 and would run from March 2010 through May 1, 2010. Plaintiff's monthly mortgage payments were reduced to the amount of $1,880.67. Plaintiffs signed the form along with another 4506-T Request for Transcript of Tax Form and forwarded all of the required documentation back to Bank of America prior to the March 1, 2010 deadline indicated on the correspondence.

39. This Trial Period Plan Agreement was entitled "Home Affordable Modification Trial Period Plan," and the first sentence of the agreement provides: "If I am in compliance with this Trial Period Plan and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." Section 3 of the Trial Period Contract Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

40. The Trial Period Plan Agreement further provides in Section 2 that the Loan Modification Agreement will be effective on "the first day of the month following the month in which the last Trial Period Payment is due," and that "TIME IS OF THE ESSENCE."

41. Plaintiffs made their Trial Period payment for the months of March, April, and May.

**E. Bank of America Fails to Follow HAMP**

42. During this time, Plaintiffs continued to submit the documents requested by Bank of America.

43. Plaintiffs also continued to call Bank of America to check on the status of their permanent HAMP modification, and were advised to keep paying their trial period plan amount because Plaintiffs were still under review.

44. On or around July 20, 2011, Plaintiffs were inexplicably denied for their permanent modification through HAMP.

10

45. After they were denied their loan modification, Plaintiffs were later informed that Bank of America misplaced approximately $10,000.00 of their mortgage payments.

46. After numerous phone calls and correspondences, Bank of America employee, Urshay Hill, uncovered that Plaintiffs' payments were placed in other borrowers' accounts by an employee in India.

47. Despite this revelation, Bank of America did not return the funds to the Plaintiffs account and still reports this misplaced amount as past due on the Plaintiffs' account.

**F.  Bank of America Threatens to Foreclose**

48. In correspondence dated October 14, 2011, Bank of America sent Plaintiffs an "Important Message About Your Home Loan." This letter stated that it "recently received Plaintiffs' payment in the amount of $2,205.12," and that the total amount due after applying the payment to the loan was $15,171.23.

49. Four days letter, Bank of America sent Plaintiffs correspondence dated October 18, 2011, returning the $2,205.12 payment. This letter also stated that Bank of America would be conducting a foreclosure sale.

50. Bank of America and its agents continue to send Plaintiffs notice that it is proceeding with a foreclosure.

**G.  Factual Allegations Regarding Plaintiffs' RESPA Claims**

51. On or around October 27, 2011, Plaintiffs forwarded a Qualified Written Request to Bank of America pursuant to RESPA. This letter indicated that Plaintiffs had been current on their mortgage payments even though Bank of America was indicating

that they were nearly a year behind. The letter further detailed telephone conversations between Plaintiffs and representatives of Bank of America, where representatives informed Plaintiffs that their mortgage payments had been placed in other homeowners' accounts and demanded an investigation and explanation for the misapplication of payments.

52.     The October 27, 2011 correspondence also requested a reinstatement quote outlining the charges that Bank of America assessed on the Plaintiffs' account. In addition, Plaintiffs requested either an explanation of or refund for any default servicing fees.

53.     Bank of America did not respond to the October 27, 2011 correspondence.

### H. Factual Allegations Regarding Plaintiffs' FCRA Claims

54.     On or around October 2011, Plaintiffs obtained copies of their credit reports with Experian, Trans Union, and Equifax and learned that each were reporting a mortgage delinquency that did not exist.

55.     Specifically, Plaintiffs' credit files indicated that they were delinquent on their mortgage loan to Bank of America since May 2009.

56.     This credit reporting was inaccurate because Plaintiffs had made timely payments on their mortgage loan from May 2009 through January 2010.

57.     Additionally, Plaintiffs entered into a Trial Period Plan in January 2010 through the federal government's Home Affordable Modification Program ("HAMP").

58.     Plaintiffs paid in accordance with their Trial Period Plan until July 2011, when they were inexplicably denied a permanent modification.

59. After receiving their denial for a permanent modification through HAMP, Plaintiffs began making their regular monthly mortgage payments.

60. On or around October 28, 2011, separately forwarded written dispute letters to Experian, Trans Union, and Equifax regarding the inaccurate mortgage account reporting within their credit reports. Plaintiffs enclosed a copy of their loan modification they received from Bank of America and proof of payments made from May 2009 through October 2011.

61. Upon information and belief, Experian, Trans Union, and Equifax each forwarded Plaintiffs' dispute letters with their enclosures to Bank of America, who verified the inaccurate information on Plaintiffs' credit files.

62. On or around January 12, 2011, Plaintiffs separately forwarded follow-up written dispute letters to Experian, Trans Union, and Equifax regarding the erroneous results of their investigations into the inaccurate mortgage account reporting within their credit files. Plaintiffs once again enclosed a copy of a loan modification they received from Bank of America and proof of payments made from May 2009 through October 2011.

63. Upon information and belief, Experian, Trans Union, and Equifax each forwarded Plaintiffs' follow-up dispute letters with their enclosures to Bank of America, who verified the inaccurate information on Plaintiffs' credit files.

64. The Bank of America reportings are false. Plaintiffs have made each and every monthly mortgage payment to Bank of America.

65. Defendants had actual knowledge of these inaccuracies and deliberately chose to ignore and permit reporting of the inaccurate account.

66. Upon information and belief, Experian, Trans Union, and Equifax each prepared and published to third parties multiple inaccurate consumer reports about Plaintiffs which contained inaccurate derogatory information regarding their accounts.

67. Upon information and belief, Experian, Trans Union, and Equifax each forwarded Plaintiffs' disputes to Bank of America on one or more occasions. Upon information and belief, Bank of America was provided notice of Plaintiffs' disputes and despite such notice, it failed and refused to investigate and correct its inaccurate reports.

## COUNT ONE: BREACH OF CONTRACT FOR BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

68. Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

69. A covenant of good faith and fair dealing exists in every valid Virginia contract, including notes and deeds of trust pertaining to real property such as the note and deed of trust pertaining to Plaintiff's property. A breach of covenant of good faith and fair dealing is a breach of the underlying contract.

70. Bank of America failed to perform its duty of good faith and fair dealing with respect to Plaintiffs by refusing to credit their payments to their account when they realized they had credited them to other homeowner's accounts; inducing them into applying for a HAMP loan modification and Trial Period Plan without disclosing that it would consider the reduced monthly payment to be a delinquency or default that would place the loan into arrears and could trigger foreclosure; failing to abide by the terms of the Note and Deed of Trust that govern the original loan; failing to follow HAMP guidelines; failing to properly safeguard and maintain important documents provided by Plaintiffs; after inducing Plaintiffs to enter into a TPP; Bank of America sent successive

loan modification applications, refused to work out a payment plan for the arrearages it improperly claimed were due and owing, and finally accelerated the loan and is threatening to foreclosure on Plaintiff's property.

71. Bank of America's breach of its duty to act in good faith and deal fairly with Plaintiffs breached the Note and Deed of Trust.

72. Because of its breach of the implied covenant of good faith and fair dealing, Bank of America is not entitled to exercise its remedy of foreclosure under the Deed of Trust.

73. Plaintiffs also suffered actual damages including but not limited to the money that was placed in other homeowner's accounts, the accrual of default servicing fees and foreclosure fees, the assessment of late fees even though they have always paid in accordance with Bank of America's instruction and are threatened with additional harm from Defendant's breach.

74. To the extent actual damages will not fully and fairly compensate Plaintiffs, they are also entitled to specific performance and other appropriate injunctive relief.

### COUNT TWO: VIOLATION OF FAIR CREDIT REPORT ACT
### 15 U.S.C. § 1681s-2(b)(1)(A)

75. Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

76. On one or more occasions within the past two years, by example only and without limitation, *Bank of America* violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate the Plaintiffs' disputes.

77. As a result of *Bank of America's* violations of 15 U.S.C. §1681s-2(b)(1)(A), Plaintiffs suffered actual damages, including but not limited to: loss of credit,

damage to reputation, embarrassment, humiliation and other mental and emotional distress.

78. The violations by *Bank of America* were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, *Bank of America* was negligent, which entitles the Plaintiffs to recovery under 15 U.S.C. §1681o.

79. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from *Bank of America* in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT THREE: VIOLATION OF FAIR CREDIT REPORT ACT
## 15 U.S.C. § 1681s-2(b)(1)(B)

80. Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

81. On one or more occasions within the past two years, by example only and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agencies.

82. As a result of Bank of America's violations of 15 U.S.C. §1681s-2(b)(1)(B), Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

83. The violations by Bank of America were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Bank of America was negligent, which entitles Plaintiffs to recovery under 15 U.S.C. §1681o.

84. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Bank of America in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

### COUNT FOUR: VIOLATION OF FAIR CREDIT REPORT ACT
### 15 U.S.C. § 1681s-2(b)(1)(C) and (D)

85. Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

86. On one or more occasions within the past two years, by example only and without limitation, Bank of America violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the Bank of America representations within Plaintiffs' credit files with Experian, Trans Union, and Equifax without also including a notation that this debt was disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency.

87. As a result of Bank of America's violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

88. The violations by Bank of America were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Bank of America was negligent, which entitles Plaintiffs to recovery under 15 U.S.C. §1681o.

89. Plaintiffs are entitled to recover actual damages, statutory damages, costs and attorney's fees from Bank of America in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and §1681o.

## COUNT FIVE: VIOLATION OF REAL ESTATE AND SETTLEMENT PROCEDURES ACT
## 12 U.S.C. § 2605(e)

90. Plaintiffs reallege and incorporate all other factual allegations set forth in the Complaint.

91.    On one or more occasions within the past two years, by example only and without limitation, Plaintiffs made multiple qualified written requests to Bank of America insisting that it conduct an investigation to correct inaccurate account information, inaccurate credit reporting and to provide information regarding their loan.

92.    Plaintiffs made their qualified written requests on September 9, 2011, and October 27, 2011.

93.    Plaintiffs' written communications were sent to the address at which they were instructed by Bank of America.

94.    Bank of America violated the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605(e), by:

   a.      Failing to timely provide a written notice of receipt of the inquiries;

   b.      Failing to provide any written notice of receipt of the inquiries;

   c.      Failing to timely conduct an appropriate investigation of Plaintiffs' inquiries;

   d.      Failing to conduct any investigation whatsoever regarding Plaintiffs' inquiries;

   e.      Failing to timely provide Plaintiffs with a true and accurate written explanation or clarification;

f.      Failing to provide Plaintiffs with any information whatsoever regarding their inquiries;

g.      Continuing to report information regarding allegedly overdue payments to the national credit bureaus.

95.  As a result of Bank of America's violations of 12 U.S.C. § 2605(e), the Plaintiffs suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

96.  Bank of America is liable for actual damages in an amount to be determine by the Court pursuant to 15 U.S.C. § 2605(f).

97.  Bank of America's conduct appears to be a pattern and practice of misconduct with many consumers. Plaintiff has been a victim of this pattern of misconduct. For each violation of 12 U.S.C. § 2605(e), Bank of America is also liable to each Plaintiff for additional damages up to $1,000 per violation.

98.  Plaintiffs are also entitled to recover costs and attorneys' fees from Bank of America in an amount to be determined by the Court pursuant to 12 U.S.C. § 2605(f)(3).

WHEREFORE, Plaintiffs demand judgment for actual, statutory and punitive damages against Defendants, jointly and severally; for their attorneys' fees and costs; for prejudgment and post-judgment interest at the judgment rate, and such other relief the Court deems just and proper.

**TRIAL BY JURY IS DEMANDED**

Adelina and Miguel Rocabruna

By _____
Counsel

19

Kristi C. Kelly, VSB#72791
Andrew J. Guzzo, VSB#82170
SUROVELL, ISAACS, PETERSEN & LEVY, PLC
4010 University Drive, Second Floor
Fairfax, Virginia 22030
(703) 251-5400 – Telephone
(703) 591-9285 – Facisimile
Email: kkelly@siplfirm.com
Email: aguzzo@siplfirm.com

Leonard A. Bennett, VSB#37523
Susan M. Rotkis, VSB#40693
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1-A
Newport News, VA 23601
(757) 930-3660 – Telephone
(757) 930-3662 – Facsimile
Email: lenbennett@clalegal.com
Email: srotkis@clalegal.com